**Reversed and Remanded and Memorandum Majority Opinion and Memorandum Concurring Opinion filed August 23, 2022.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-20-00804-CV

---

### JENNIFER GWYNNE CAPELO, AS ADMINSTRATOR OF THE ESTATE OF DECEDENT JUNE YVONNE RIVERA, Appellant

### V.

### GALE LILLIMAN D/B/A GULF COAST BAIL BONDS, Appellee

---

**On Appeal from the Probate Court**
**Galveston County, Texas**
**Trial Court Cause No. PR-0077921-A**

---

## MEMORANDUM MAJORITY OPINION

Jennifer Gwynne Capelo, as administrator of the estate of decedent June Yvonne Rivera, appeals the trial court's grant of summary judgment favoring appellee Gale Lilliman d/b/a Gulf Coast Bail Bonds. Capelo alleged that a partnership existed between the decedent, Rivera, and Lilliman to own and operate a bail bonds business and sought an accounting of partnership assets and a winding up of partnership affairs. Lilliman denied that a partnership existed and filed a

traditional motion for summary judgment on that ground, which the trial court granted. Concluding Lilliman has not demonstrated his entitlement to judgment as a matter of law, we reverse the summary judgment and remand the case to the trial court for further proceedings.

## *Background*

After Rivera's death, Capelo made demands to Lilliman as administrator of Rivera's estate concerning an alleged partnership to run a bail bonds business between Rivera and Lilliman. Lilliman then filed a declaratory judgment action against Capelo as administrator of the estate, and Capelo filed a separate action seeking an accounting and winding up, among other things. The two actions were then consolidated into the present lawsuit. In her petition, Capelo alleged that Rivera and Lilliman formed a partnership in 1986 and jointly owned and operated various bail bonds businesses in Galveston and surrounding counties. Rivera provided the "business know how" and cash, and Lilliman provided "sweat equity" and cash. Capelo further alleged that in 2001, Lilliman told Rivera, who apparently had health issues, that she should stay home and still receive her share of partnership profits, which she received until her death in 2016. As part of the arrangement, Rivera agreed her partnership share would be reduced to 40 percent. After Rivera's death, Lilliman denied the existence of the partnership.

Lilliman filed a traditional motion for summary judgment, seeking a take nothing judgment on all Capelo's claims and a declaration that no partnership had existed between himself and Rivera. The grounds for the motion will be discussed in detail below. Lilliman attached his own affidavit denying a partnership existed as well as other documents in support of the motion. In response, Capelo submitted her own affidavit, as well as an affidavit from a former employee of the bail bonds business; a deposition of Lilliman's office manager, who confirmed Lilliman

2

directed monthly payments to Rivera until her death; and other documents.

Lilliman also raised numerous objections to Capelo's summary judgment evidence. The trial court granted all the evidentiary objections and summary judgment favoring Lilliman. In its final judgment, the trial court ordered Capelo take nothing on her claims, declared the estate owns no ownership interest in the business known as Gulf Coast Bail Bonds, and awarded attorney's fees to Lilliman.

In five issues on appeal, Capelo contends the trial court erred in (1) holding no bail bonds business could be owned or operated as a partnership; (2) sustaining Lilliman's objections to Capelo's summary judgment evidence; (3) finding that no genuine issue of material fact existed and ordering Capelo take nothing on her claims; (4) declaring the estate owns no interest in the bail bonds business; and (5) awarding attorney's fees to Lilliman. Lilliman expressly declined to file an appellee's brief in response to Capelo's appellant's brief.

### Standards of Review

In a traditional motion for summary judgment, if the movant's motion and summary judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the nonmovant to raise a genuine, material fact issue sufficient to defeat summary judgment. *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000). In our de novo review of a trial court's summary judgment, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all the summary judgment evidence. *Goodyear Tire &*

*Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

## *Discussion*

In his motion for summary judgment, Lilliman first noted that all issues in the case hinged on whether a partnership existed between Lilliman and Rivera to own and operate a bail bonds business. He then asserted that no such partnership existed as a matter of law because Texas Occupations Code section 1704.001 prohibits the ownership of a bail bonds business by a partnership. He further asserted that evidence conclusively established that no such partnership existed, particularly citing his own affidavit denying the existence of a partnership, the assumed name record certificate for Gulf Coast Bail Bonds that lists only Lilliman as an owner, and two applications for bail bond licenses filed by Rivera in which she did not state she had an ownership interest in Gulf Coast Bail Bonds. We will first address the Occupations Code argument and then will turn to the evidentiary argument.

**Occupations Code.** As stated, Lilliman's first ground for summary judgment asserted that under section 1704.001 of the Occupations Code, a bail bonds business could not be owned by a partnership. He further argued that "an agreement which is in violation of the law also violates public policy, is void and will not be enforced," citing *McCreary v. Bay Area Bank & Trust*, 68 S.W.3d 727, 733 (Tex. App.—Houston [14th Dist.] 2001, no writ). We disagree, however, with Lilliman's interpretation of section 1704.001.

The proper interpretation of statutory language is a matter for de novo review. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). Our objective in construing a statute is to determine and give effect to the legislature's intent. *See Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex. 2000). If possible, we must ascertain that intent from the language in the statute and not look

4

to extraneous matters. *Id*. If the wording of the statute is unambiguous, we adopt the interpretation supported by the plain meaning of the provision's words and do not engage in forced or strained constructions. *St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex. 1997). We presume that every word was deliberately chosen and that excluded words were intentionally excluded. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981).

Section 1704.001 provides definitions for use in Chapter 1704 of the Occupations Code, which concerns the regulation of bail bond sureties. In his motion, Lilliman offered no analysis of the section to support his assertion that it prohibits a partnership from owning a bail bonds business. The section states in full as follows:

> In this chapter:
>
> (1) "Bail bond" means a cash deposit, or similar deposit or written undertaking, or a bond or other security, given to guarantee the appearance of a defendant in a criminal case.
>
> (2) "Bail bond surety" means a person who:
>
>> (A) executes a bail bond as a surety or cosurety for another person; or
>>
>> (B) for compensation deposits cash to ensure the appearance in court of a person accused of a crime.
>
> (3) "Board" means a county bail bond board.
>
> (4) "Bonding business" or "bail bond business" means the solicitation, negotiation, or execution of a bail bond by a bail bond surety.
>
> (4-a) "Final judgment" means a judgment that disposes of all issues and parties in a case.
>
> (5) "Person" means an individual or corporation.

Tex. Occ. Code § 1704.001.

Nothing in the section explicitly states that a bail bonds business cannot be owned or operated by a partnership. Subsection (2) notes that a "bail bond surety" is a "person," and subsection (5) provides that "person" in the chapter "means an individual or corporation," but this indicates at most that a partnership cannot be a "bail bond surety"; it does not prohibit a partnership from owning and operating a bail bonds business. Subsection (4) defines "bonding business" and "bail bond business" as "the solicitation, negotiation, or execution of a bail bond by a bail bond surety"; however, this does not explicitly or implicitly bar a partnership from owning and operating a bail bonds business. Indeed, the use of those terms in the remainder of Chapter 1704 finds them primarily used to identify the type of business being regulated and not specific businesses. *See, e.g.*, Tex. Occ. Code §§ 1704.101, .109, .152, .252, .302. In other words, a "bonding business" or "bail bond business" is the type of business involving "the solicitation, negotiation, or execution of a bail bond by a bail bond surety." This does not necessarily mean that a partnership cannot own or operate a business that involves the solicitation, negotiation, or execution of a bail bond, so long as a bail bond surety is involved in the solicitation, negotiation, or execution. Lilliman does not cite and research has not revealed any authority to the contrary.

For further understanding of the definitions in section 1704.001, we turn to section 1704.252, which provides grounds for which a bail bond licensing board may suspend or revoke a license. Subsection (9) of that section provides that a board may revoke or suspend a license if the license holder "pays commissions or fees to or divides commissions or fees with, or offers to pay commissions or fees to or divide commissions or fees with, a person or business entity not licensed under this chapter." *Id*. § 17.04.252(9). At least one court has interpreted this section as providing that someone authorized to execute bail bonds—in that case an attorney,

not a licensee—may not form a partnership to operate a bail bonds business with someone who was not authorized to execute bail bonds. *Villanueva v. Gonzalez*, 123 S.W.3d 461, 465–67 (Tex. App.—San Antonio 2003, no pet.). That construction appears logical. It also suggests that the opposite would not be prohibited, *i.e.*, that a person licensed under the chapter could partner with and divide commissions with another person licensed under the chapter. If that were not the case, the legislature would have barred the splitting of bail bond commissions rather than just barring the sharing of commissions between a licensed person and a nonlicensed person.

As the *Villanueva* court noted, the purpose of subsection 1704.252(9) appears to be to prohibit unregulated persons from participating in a bail bonds business. *Id.* at 466 ("If individuals who are qualified to act as bail bond sureties could split commissions or fees with those who do not meet the statute's requirements or exceptions, a bail bond board could not regulate them."). In the present case, Rivera and Lilliman were both licensed as bail bond sureties; thus, both were subject to regulation by county bail bond boards. Although there is some indication in the record that Rivera may have allowed her license to lapse at some point in the 2000s, the question of what would happen to a partnership if one of the partners lost their license is beyond the scope of this summary judgment appeal. Lilliman's first ground for summary judgment posited that Occupations Code section 1704.001 bars the ownership of a bail bonds business by a partnership. Contrary to Lilliman's assertion, section 1704.001 does not prohibit partnerships from owning or operating bail bond businesses.[1] The trial court erred to the extent

---

[1] Moreover, because section 1704.001 does not prohibit partnerships from owning or operating bail bond businesses, Lilliman's citation to *McCreary*, 68 S.W.3d at 733, for the proposition that "an agreement which is in violation of the law also violates public policy, is void and will not be enforced," is inapplicable in this case.

7

it based summary judgment on this ground.

**Evidentiary arguments.** In support of his contention that the existence of a partnership was conclusively disproven, Lilliman cited his own affidavit as well as two applications for a bail bond license filed by Rivera in Galveston County and the assumed name record certificate for Gulf Coast Bail Bonds also filed in Galveston County. In the two applications for a license, dating from 1998 and 2000, Rivera stated that "[t]he name under which my business as a professional bondsman shall be conducted is A&A Associates Bail Bonds." She did not deny in the applications that she was a partner with Lilliman. Lilliman did not offer any applications from other years or counties. In her petition, Capelo alleged that Rivera and Lilliman formed a partnership in 1986 and jointly owned and operated various bail bonds businesses, including specifically Gulf Coast Bail Bonds and A&A Associates Bail Bonds. Nothing in the applications conclusively refutes the claim that Rivera and Lilliman were partners.

The assumed name certificate from 1986 for Gulf Coast Bail Bonds states that the business is a "proprietorship" and lists only Lilliman as owner. Although this may be relevant evidence regarding whether a partnership existed, the fact that Lilliman listed only himself as an owner of a business on this form does not conclusively negate the existence of a partnership, and Lilliman has offered no specific argument to the contrary.

Lilliman did not cite any specific part of his affidavit as conclusively disproving a partnership existed, but we note that he denied the existence of a partnership in the affidavit and asserted instead that he employed Rivera in the bail bond business until the late 1990s when he terminated her employment but

8

continued paying her monthly bills until her death in 2016.[2] A summary judgment may be based on the uncontroverted testimonial evidence of an interested witness if the evidence is clear, positive, and direct; otherwise credible and free from contradictions and inconsistencies; and could have been readily controverted. Tex. R. Civ. P. 166a(c); *see also Gabriel v. Associated Credit Union of Tex.*, No. 14-12-00349-CV, 2013 WL 865577, at *2 (Tex. App.—Houston [14th Dist.] Mar. 7, 2013, pet. denied) (mem. op.). Assuming Lilliman's denial of a partnership in his affidavit could have been readily controverted if untrue, we turn to a consideration of Capelo's evidence.

Capelo's key evidence was her own affidavit, to which Lilliman lodged and the trial court sustained numerous objections including that the statements in the affidavit were conclusory. Capelo challenges all of the trial court's evidentiary rulings in this appeal. We must therefore address the sustained objections to Capelo's evidence before we can reverse on the basis of that evidence. Capelo's affidavit is certainly not without problems. For example, many of the statements in the affidavit, although relevant to issues in the case, do not identify any basis for Capelo's knowledge. To avoid being conclusory, an affidavit must provide specific factual bases for the statements made. *E.g.*, *SouthTex 66 Pipeline Co. v. Spoor*, 238 S.W.3d 538, 542 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Merely reciting that an affidavit is based on personal knowledge is insufficient; the affidavit must actually disclose the basis on which the affiant has personal knowledge of the facts asserted. *Id*. at 542–43.[3]

---

[2] Lilliman did not offer any specific reason for the continuing payments to Rivera but mentioned she "had essentially become family to" him and suggested she had originally told him about the business opportunity in bail bonds. In her petition, Capela asserted that Rivera and Lilliman had a romantic relationship that ended in the early 1990s. Rivera was married at the time of her death in 2016.

[3] It appears from context in Capelo's affidavit and statements in Lilliman's affidavit that

Among the statements in the affidavit that we will consider in our review, Capelo explained that the business was originally run out of her mother Rivera's home and that Capelo would answer the phone when Rivera became too exhausted to do so. Capelo also described an argument between Rivera and Lilliman that she personally observed in 1987, in which Rivera "argued that they each owned fifty percent and [Lilliman] countered with 'most of the money was mine so you should only get twenty percent.'" According to Capelo, they then settled on a 60/40 split favoring Lilliman. Capelo provided sufficient basis for her personal knowledge reflected in these statements (*i.e.*, personal observation), and the trial court erred in sustaining the conclusory objection to this portion of the affidavit. Viewed in the light most favorable to Capelo, these statements directly controvert Lilliman's assertion that no partnership existed. *See Mack Trucks, Inc.*, 206 S.W.3d at 582.

Lilliman additionally, specifically objected that the portion of Capelo's affidavit in which she asserted she observed an argument between Rivera and Lilliman (1) constitutes a "sham affidavit" and (2) violates the Dead Man's Rule. The sham affidavit rule applies when a subsequent affidavit clearly contradicts the witness's earlier testimony involving the suit's material points without explanation. *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 88 (Tex. 2018). The rule is not to be mechanically applied but requires a case-by-case analysis. *Id*. Here, Lilliman complained that Capelo's affidavit contradicted Rivera's prior statements in two applications for bail bond licenses, wherein she identified her business as A&A Associates Bail Bonds and not Gulf Coast Bail Bonds. However, even assuming the rule could apply to Capelo's affidavit in light of Rivera's prior applications, there is no "clear contradiction" between the two documents. As discussed above,

Capelo worked for the bail bonds business at some point, but her affidavit does not describe how she obtained much of the information she provides regarding the alleged business relationship between Rivera and Lilliman in the course of her employment or otherwise.

10

Rivera did not deny the existence of a partnership in her license applications and Capelo's pleadings in this case assert a partnership existed and that the partners jointly owned and operated various bail bonds businesses, including A&A Associates Bail Bonds. The trial court erred in sustaining the sham affidavit objection to this portion of Capelo's affidavit.

We interpret Lilliman's broad Dead Man's Rule objection as encompassing Capelo's testimony regarding the argument and ultimate agreement that she reportedly observed between Rivera and Lilliman. The Dead Man's Rule generally prohibits a party to certain types of lawsuits from testifying regarding oral statements by a decedent unless the statements are corroborated or were solicited by the opposing party. Tex. R. Evid. 601(b); *Est. of Wright*, 482 S.W.3d 650, 655 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). Courts construe the Dead Man's Rule narrowly. *Fraga v. Drake*, 276 S.W.3d 55, 61 (Tex. App.—El Paso 2008, no pet.); *Coleman v. Coleman*, 170 S.W.3d 231, 239 (Tex. App.—Dallas 2005, pet. denied). To evade the rule, corroborating evidence need not be sufficient standing alone but must tend to confirm and strengthen the testimony of the witness and show the probability of its truth. *Fraga*, 276 S.W.3d at 61; *Coleman*, 170 S.W.3d at 239.

Here, Capelo's affidavit testimony was to some degree corroborated by the acknowledged fact that the bail bonds business continued to pay a monthly amount to Rivera for years after she ceased actively working for the business. Lilliman acknowledged this in his affidavit, and his office manager, Tammy Stephens, confirmed in her deposition that the business made these regular payments to Rivera. Lilliman objected to this portion of Stephens' deposition as speculative and irrelevant, and the trial court sustained the objections. However, the testimony that the business paid amounts to Rivera is neither speculative nor irrelevant. *See*

11

*generally* Tex. R. Evid. 401 (explaining that evidence is relevant if it has any tendency to make the existence of a consequential fact more or less probable than it would be without the evidence); *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009) ("[S]peculative opinion testimony is not relevant evidence because it does not tend to make the existence of material facts more probable or less probable."). The trial court therefore erred in sustaining these objections to that portion of the deposition. Although Lilliman did not expressly state why the business continued these payments, he did mention that Rivera "had essentially become family to" him and suggested she originally informed him about the business opportunity in bail bonds. However, the fact that there may be some unspecified alternative explanation for the payments does not completely erode the tendency of that evidence to corroborate Capelo's statements regarding the existence of a partnership between Rivera and Lilliman.

Statements in the affidavit of Gerald Ramos also tend to corroborate Capelo's statements regarding the existence of a partnership. Ramos explained that he was employed by the bail bonds business from 1998 to 2000. Rivera interviewed, hired, and trained him for the job and ran the business without Lilliman for the first six months or so that Ramos worked there.[4] Ramos also stated that the mail delivered to the business was usually addressed to both Rivera and Lilliman. Once Lilliman returned to the business, Ramos stated that Lilliman and Rivera appeared to run the business as equals and each often deferred to the other. Lilliman objected to Ramos affidavit on the ground that it was mostly irrelevant and the portions that were not were conclusory. The trial court sustained the objections. Although some of Ramos's statements are irrelevant and some are conclusory and do not clearly flow from his employment in the business, the

---

[4] It has been alleged that Lilliman was in jail during this period of time, but the truth of this assertion is not determinative of this appeal.

nonclusory statements—the ones stemming directly from his personal observation—tend to corroborate Capelo's testimony regarding the existence of a partnership, even if they are not sufficient standing alone to establish the existence of a partnership. *See Fraga*, 276 S.W.3d at 61; *Coleman*, 170 S.W.3d at 239.

Because additional evidence tends to corroborate Capelo's statements in her affidavit, those statements are excepted from the Dead Man's Rule. *See* Tex. R. Evid. 601(b); *Fraga*, 276 S.W.3d at 61; *Coleman*, 170 S.W.3d at 239. Because those statements and the corroborating evidence, viewed in the light most favorable to Capelo, controvert Lilliman's assertion that no partnership existed, the trial court erred in granting summary judgment favoring Lilliman on the ground that there was no genuine issue of fact regarding the existence of a partnership. *See Mack Trucks, Inc.*, 206 S.W.3d at 582.

## *Conclusion*

We sustain Capelo's first, third, and fourth issues challenging the trial court's grant of summary judgment. We also sustain in part Capelo's second issue to the extent that it challenged the trial court's evidentiary rulings that we stated above were in error. The remainder of Capelo's challenges to the trial court's evidentiary rulings are moot. We further sustain Capelo's fifth issue challenging the trial court's award of attorney's fees to Lilliman, which was based on the grant of summary judgment.

We reverse the trial court's summary judgment and remand and the case to the trial court for further proceedings.


/s/    Frances Bourliot
       Justice

Panel consists of Chief Justice Christopher and Justices Bourliot and Spain. (Christopher, J., concurring).